May it please the court, Edward Powers on behalf of the Republic of Iraq. The key question with respect to sovereign immunity here, and Iraq's assertion of sovereign immunity, is whether an exception applies. And the primary concern with respect to the exception argued here is under section 1605A2 of the Sovereign Immunities Act, which is the third sub-clause, which is often referred to as the direct effect clause. The leading case here is Weltover v. The Republic of Argentina, and there the Supreme Court had no problem finding that there was a direct effect because payments were due in the United States, payments had been made in the United States, and Argentina defaulted in making those payments. Similarly, in this court's decision in Adler v. Nigeria, the court found that a direct effect occurred because payments were not made in New York once they were due, and I want to focus on that language, once they were due, because that's what distinguishes the case before this court from those decisions I mentioned. In this case, when the contracts were terminated by Iraq's agency, the SOMA, Strategic Oil Marketing, State Oil Marketing Organization, there was nothing due on the contracts in New York. The agreements that were signed really just set a framework for purchasing oil by the plaintiffs. They had all sorts of things they needed to do once those agreements were entered into, nominating a vessel, finding a buyer, these were oil brokers. And both contracts were in fact extended because plaintiffs had not yet triggered that obligation on their part, attempted to purchase any oil. In their brief to this court, plaintiffs acknowledged that they had no obligation to pay, make payment in New York when the contracts were terminated, that's at page 32 of their brief, and suggest that the direct effect of the termination of those agreements was that they were deprived of their opportunity to request to purchase oil. But that direct effect wouldn't have occurred in the United States. That presumably would have occurred in Cyprus, where the plaintiffs are headquartered. They have no office in the United States. So in that regard then, when the contracts were terminated, the question is was there an immediate consequence in the United States? And the answer is clearly no, because there was no obligation in place, unlike in those other decisions, to pay in the United States. So that's the Adler test, right, the immediate consequence language is from Adler. So there wasn't an immediate effect like there was in Adler or in Welthover, where money was supposed to be deposited and it wasn't. But there was a close follow-on effect, right, because if Iraq had not breached the contract for their allegations, then there would have been a purchase and sale of oil, and the money would have then been deposited by Turankian and Pentonville into that bank for Iraq's account, right? I respectfully disagree because there was a lot that would have had to happen for them to actually purchase oil once they requested it. As I mentioned earlier, they needed to find a buyer. Let's say they did. They needed to nominate a vessel that had to be approved. But perhaps most important, and what we focus on in our briefs to the court, is the intervening element. The plaintiffs have admitted, they acknowledged in their filings, that they intended to use a third-party refiner. Had they gone forward before the contracts were terminated, if they had not been terminated, they intended to use a third-party refiner. And that's in the record at 31 and 33. But the agreements required SOMO's approval for that, and that's in both agreements at 67 and 104. And otherwise, if SOMO didn't approve, that's grounds for termination of the contracts. But that hadn't occurred, right? I mean, SOMO could have still approved. Merely getting a third-party refiner lined up didn't breach the contract, right? No, SOMO still had to approve. But that breaks the chain of causation. SOMO would have had every right under the agreement to say, no, we don't approve, and allow the agreements to lapse. But then couldn't the purchaser have said, okay, in that case, I'll just do it myself? Well, the purchaser, they're suing for brokerage commissions. They're brokers. So I don't think they would have. They don't have the capability. That's correct. And in any event, we're still speculating now. We're beyond the question for direct effect, as the Supreme Court and this court has repeated, is whether there is something that invariably follows from the antecedent. And once you have a break in the chain of causation, it doesn't invariably follow. And in the Cruz Connections case that both sides have cited to the court in the D.C. Circuit, there were a number of contracts involved, and some did furnish that direct effect, because as the Cruz Connections court put it, it was a done deal. The effect was going to take place. Revenues were going to be generated, either in the United States or with the use of United States resources, vessels. But in one respect, there was an agreement at issue that called for the plaintiff to receive revenues from onboard purchases of food and drinks by the parties using the cruise ship. And with that one, the D.C. Circuit said, well, here it's harder to find a direct effect, because we don't know if anybody would have purchased food or drink, and therefore whether any revenues would have been generated. And they said the plaintiffs may have received nothing as a result of that agreement. And to paraphrase that, with respect to this case, the U.S. bank account that was set up to receive payment might have received nothing, even if Iraq had gone forward with the contract. So the breach of what you're saying is Iraq's breach of that contract, there were so many steps in between that and any payment into the bank in New York for Iraq's account, that it breaks the chain for the direct effects purpose. Is that your argument? Yes, Your Honor. But I particularly emphasize the undisputed fact that the plaintiffs intended to, if they had had a chance to trigger it after these extensions, they intended to use a refiner that required SOMO's approval. And it's an unknown whether SOMO would have approved. They didn't have an obligation to approve. There are other provisions. There's at least one other provision in the agreement where SOMO is required to approve without unreasonably withholding its consent. But that doesn't apply with respect to the use of a third-party refiner. Counsel, Judge Gould, if I could interject, please. Yes. Just one question. Could you at some point in your argument address the significance of the arbitration provisions? Yes, Your Honor. I'll get to that very quickly. Thank you. In fact, I'll just go to it now. The parties in this contract, both of them, agreed to arbitrate. It's very clear that it covers the claims in this case, the contract dispute. The district court found that the plaintiffs had not met their burden, had not shown that compliance with the arbitration agreement would be impracticable or impossible. Under the strong liberal federal policy endorsed by the Supreme Court in Moses Cone and in Mitsubishi, particularly in the context of international arbitrations, that should have been the end of the case. They had an agreement to arbitrate, and they've disregarded it. Now, they make some noises about the fact that things are difficult in Iraq back in 2003 when they filed their complaint. But things were better by the time they served their complaint and filed proof of service in April 2006. The Hussein regime was out of power. The interim and transitional governments of Iraq were in place. It was a democracy. It is a democracy. And they signed this agreement to arbitrate back when Saddam Hussein was in power. So it's ironic that they would continue to take the position that it's impracticable or impossible to arbitrate in Iraq. And I might add that the agreement expressly provides for any other form chosen. So Iraq is not the only form. The parties can agree to a different form if they so choose. Plaintiffs have never sought that. They've never asked for arbitration and suggested a different form. And finally, with respect and very important, the arbitration agreement also says that the arbitrators will be selected pursuant to the rules of the International Chamber of Commerce. Those rules provide for the location to be designated by the Chamber of Commerce court and for the hearings and other taking of evidence to be held at the location selected by the panel if it's not otherwise agreed. So your argument, as you're arguing to us now, is that the district court was wrong in denying your motion to dismiss. But why would we have jurisdiction over that? It's not on the list of issues we have jurisdiction over for that sort of interlocutory appeal. Well, this court has held a couple of times, including in the Think, Inc. case and in the Sparling case, that a request to stay under Federal Arbitration Act Section 3 can be treated as a request, a motion to dismiss, the equivalent of a motion to dismiss for purposes of the FAA, where all the issues that would be remaining are covered by the arbitration clause. So in the first instance, you would have jurisdiction under Section 16 of the Federal Arbitration Act, which provides for immediate appeal of a denial of a stay. But this wasn't the denial of a stay to go forward with arbitration, which all of our cases are. Well, going forward with arbitration, this is really a contract issue, right? You're saying they didn't comply with the contract, which requires arbitration, so it should be dismissed. Their suit should be dismissed, and the district court said no. I don't see how that moves to arbitration. Well, at least three other circuits, the First, Sixth, and Seventh, I believe, have found that the Section 16 can be triggered after a denial of a motion to dismiss when there is an arbitration clause at issue, rather than a motion to stay. We cited those cases in our briefs. I just wanted to clarify. You're not asking us to construe the motion to dismiss as a motion for stay. You're saying that other circuit precedent says that the Arbitration Act jurisdiction would cover an appeal, a denial of a motion to dismiss. Yes, Your Honor, that's our suggestion. Also, the common law of this Court, the Enloe-Edelson Doctrine, we cite the case from the Ninth Circuit in which the Court reserved the possibility that we continue to have appellate jurisdiction over denials of motions to stay, even in the absence of the FAA. I'd like to reserve whatever time I have left for rebuttal, please. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Melinda Ebelheir, appearing on behalf of the appellees, the plaintiffs in this matter. I see that there are two main issues in this case for the Court to decide, and the first one, of course, has to do with the question of the sovereign immunity and whether or not it applies. Some of the arguments, I believe, that Appellant's Counsel was making are good arguments for a defense on the merits of whether or not there's been a breach of contract. But for this jurisdictional look into whether or not, in fact, the Court has jurisdiction, whether or not there is sovereign immunity, we don't need to go that far. There are direct effects. The Court below found the direct effect of the failure to trigger payment into a New York bank. Iraq makes the somewhat ironic argument that, well, we breached the contract, therefore we never triggered your obligation to pay, and therefore there's no direct effect. That sounds like the person throwing themselves on the mercy of the Court because they're an orphan after they murdered their parents. I was concerned, though, because in Weltover and Adler, the breach directly resulted in or the evidence of the breach was they didn't pay, they didn't deposit the money. Here, the breach is they're not prepared to make a sale, and so the payment by your client for the oil that was never sold to you seems several steps removed from the sort of immediacy as in Adler. Your Honor, if Iraq had fulfilled its obligations under the contract, there would directly have been payment. In this case, they didn't, and as a direct result, there was no payment. They won't have to sell the oil, and then they're making the argument that there was an issue about whether you would get approval for using a third-party refiner. Your Honor, there is no evidence in the record regarding whether or not approval would or would not have been given. Therefore, we're left to speculate. I could make an offer of proof that, in fact, this sort of approval was routinely given at that time and in that place, but that's a matter for a defense to a breach of contract action. It's not necessarily a matter to determine whether or not there is sovereign immunity in the first instance. But there's also another matter in terms of direct effect, and while the district court did not base their decision on this, as far as I can determine from reading it, the court nevertheless did make mention of the fact that these contracts both provided that some of this oil was headed for the American market. And, in fact, and it's in the record and it's in the court's order, there is a recitation from Mr. Terankian's declaration to the effect that the amount of the bribe which was demanded was calculated based on, well, this amount of oil is going to the United States, so we're going to charge you 30 cents a barrel in bribes for that, and this amount of oil is going to Europe, and we're going to charge you just 20 or 25, so we're going to give Europe a break, a barrel for that. That clearly has a direct effect in the United States as well. These contracts had oil that at least in part was meant for the American market. When those contracts were breached, therefore there was less oil available to the American market at a time when certainly many cynics were saying we were going to war for the purpose of oil in the first instance. So there is that extra direct effect. I had some other concerns about language in Adler that maybe you can help me with. One of them was that there had to be a legally significant act in the United States that gave rise to Terankian's claim against Iraq, which was for breach of contract. And so it was hard for me to see how the failure of Terankian to deposit money in Iraq's account in New York gave rise to the claim against Iraq. So how do you work with that language from Adler? What was the legally significant act that gave rise to the breach of contract? Your Honor, legally significant, I believe that there's a subsequent case, and I thought I had the note here with it, that questions whether or not legally significant is still an important part of the test after some of the amendments to the statute. And I could brief that for the Court in a letter brief if Your Honor would like that. Is that in your briefing or not? No, Your Honor, it's not. I don't believe the – because there is case law that suggests that the effect doesn't have to be – the direct effect can be a slight effect. It can be any effect. But it is – what does legally significant within the meaning of this case – it is legally significant, the case law suggests, when there is no obligation to pay. There is a legally significant effect when there is less – when there's a breach of a contract that has an effect that is going to be supplying goods for the American market. If Your Honor would like additional briefing on that topic, I would be happy to submit it. We'll confer, and if we want that, we'll ask you. The other language I was concerned about was – in Adler – was that New York would need to be the place of performance for Iraq's ultimate contractual obligation, is what Adler describes. But it seemed like it was a place of performance for Turankian's contractual obligation, which is to pay once it gets the oil. So how was the U.S. the place of performance for the contractual obligation? Your Honor, it's also important to look at these contracts in the context of how they were negotiated and administered under the Oil for Food Program by the United Nations. And in fact, as my brief does discuss, Iraq is trying very hard to get jurisdiction in the Southern District of New York right now over other participants in that program who did pay bribes in order to have their contracts honored by Iraq. So the whole – Iraq was sort of inextricably tied to New York. Everything had to go – everything had to be approved in New York. Everything had to be paid in New York. Everything had to be paid out of New York during the years that the Oil for Food Program was being administered. And that is a program. As recently as three weeks ago, once again, in the New York case, Iraq filed a short brief. There's a lot of briefing in that case on a motion that's been pending for a couple of years where they remind the court that there they assert that the Oil for Food Program was managed, controlled, and centered in New York. And that is a quote from their recent filing in that case. I still don't understand how the Southern District of New York action related to whether there was an exception to sovereign immunity in this case. So maybe you could help clarify that. Yes, Your Honor. In the Southern District of New York case, Iraq is seeking billions of dollars from people who entered into contracts with Iraq pursuant to the Oil for Food Program administered by the United Nations. And in order to get jurisdiction in that court over each of the hundreds of defendants, many of whom have – did not have a United States presence, the argument is that there is a commercial activity. The Oil for Food Program constituted this program, this managed, controlled, and centered in New York program, which was the only way that anybody could do business with Iraq during these years legally under United States statutes and pursuant to United Nations memoranda. And therefore, the position of Iraq in Southern District of New York is that if you participated in the Oil for Food Program, you are subject to the jurisdiction of the New York courts because of the fact that that program was centered in New York and everything that happened in commercial dealings, legal, internationally legal commercial dealings with Iraq had to happen through New York, through the offices of the United Nations there. And if I'm understanding, in those cases, then the other foreign nations would have to make payments to this New York bank account, and that would be the fulfillment of their contractual obligation. But is your argument that Iraq was doing something in New York that would waive its sovereign immunity? Your Honor, Iraq was making contracts that had to be completed in New York. And in our brief, we do cite to some of the New York jurisdictional case law to suggest that Iraq would be subject to jurisdiction in New York because it reached into New York whether it was physically present in New York or not. And that, I think, is also a question of fact. There is certainly a mission that Iraq had to the United Nations in that time. But nowadays, you don't need to be physically present to be subject to jurisdiction. You don't have to be physically present in order to have oral argument. And so, yes, Iraq has taken the position that if you participated in the Oil for Food Program, that that was a commercial activity centered in New York, and New York has jurisdiction. While Iraq participated in the Oil for Food Program, it would seem that it goes both ways. If you have made a contract in New York, you are subject to the jurisdiction in New York, whichever side of the contract you are on. And therefore, Your Honor, it is our position, and the Ilatouras Miel case, which both sides have cited, talks about the fact that commercial activity under the Oil for Food Program is a sufficient jurisdictional hook for the sovereign immunity, to waive the sovereign immunity. Counsel, if I could interject with one question. Same one I asked your opposing colleague. That is, what do you take to be the significance of the arbitration provisions? Your Honor, in this case, the arbitration clause is unenforceable for a number of reasons, the biggest one being the New York Convention. And this case is almost exactly on point with the Fifth Circuit's decision in the National Iranian Oil Company v. Ashland case, which starts out in a bit of prose, and which is cited in the brief. And in that case, the Fifth Circuit found, and there are cited in my brief a number of cases from other circuits that have held along the same lines, that the court could not compel arbitration where the designated place for arbitration is a state which has not signed on to the New York Convention for the recognition of foreign arbitral awards. And so in that case, it was Iran. In this case, it is Iraq. But the same is true in our case. The court could not compel arbitration in Iraq, excuse me, in Iran, Iraq. And in the Fifth Circuit case, there was also a provision in the arbitration award that said, or any other place the parties might agree upon. And the court said, well, the parties haven't agreed upon it, and the court didn't feel, I guess, that it had the authority to order the parties to agree. So the court simply said the arbitration agreement is not enforceable and allowed the case to proceed in Mississippi in the district court there. But here there wasn't even an attempt to seek arbitration. Your Honor, when this complaint was filed in mid-September. I know the war was on, but three months later, whenever you got around to developing the case, the war was over. Your client never asked for arbitration. Two things, Your Honor. I'm not sure that the war is over yet. We still have troops stationed in Iraq. They're not bombing Baghdad, so. In terms of. . . But he never tried to get arbitration anyplace else. Your Honor, this is. . . I don't think he had an obligation, first off, to try to get arbitration anyplace else. And in terms of trying, because the contract is pretty clear on Baghdad and under the case law, there was no obligation there. This case is a little bit different from the recent unpublished decision by this court in the Green Board Vice case, because in this case we have a plaintiff principal who was specifically targeted for death threats by the Iraqi government. That was the old regime, wasn't it? Your Honor, who knows at what point there was nobody left from the old regime. And I don't know that with all due respect to what counsel's representations are, that it's completely fine and upstanding and safe to travel, let's go visit and have a party place. Yet the State Department is still urging against travel to Iraq by citizens. And in this instance, the principal for my party is someone, as far as we know, Your Honor, we've never had any word that that warrant for his arrest has been repudiated by the party to this litigation. He was thrown into prison on the request of Iraq. At least those are the allegations. There's a declaration in the record. There's been no evidence to contradict that. And so when the person you are suing also happens to be a government that's trying to kill you, Your Honor, it would seem that that would be an excuse for not saying, well, let me come to your capital and we'll arbitrate the fact that I wouldn't pay your bribes and so now you owe me money. I want to ask you a question about the request for bribes. You don't do anything with that, and I'm not quite sure what you could do with it, but it seems to me your client on the allegations, he was being shaken down by the government of Iraq and the present government has inherited all the problems of the old government. And so the hands are not very clean, but you don't develop that at all. Your Honor, I'd be happy to. Well, has that thought ever occurred to you? Your Honor, I think I have thought of that more as a case. In this case, I was focused on the jurisdictional aspects and I'm not sure that I could unclean hands or stop them into jurisdiction. I think that that's an issue that could be taken up in the prosecution of the merits of the case once we go forward. The fact that I do think somewhere, I can't remember if it's in this brief or it was in the briefing before the Court of Appeal, I pointed out that we're in quite an unusual and prejudiced situation because not only are we litigating with a government that sometimes we've been at war with and sometimes we apparently not, but they went ahead and killed some of our prime witnesses, Your Honor, and I'm not sure exactly how we deal with that. It's a great spoliation case, I guess. But in terms of the unclean hands, I'd love to argue. I understand Your Honor's dissent in the Adler case about is it a criminal activity. My client was not involved in criminal activity, and some of the irony here is that in the New York litigation, Iraq is saying that all these defendants there put aside morals and honor for profit, and in my case, my client did not put aside morals and honor for profit before it brought him. So I do think that this is a case where clearly there is jurisdiction for the court because there are so many effects and because Iraq seems to take the position in some courts that it's one way when it wants it that way, and in other courts it's another way when it wants it that way, and there should be a consistent rule. Frankly, if I were Iraq, I might want a decision from this court that there's jurisdiction based on what happened in New York because it would help them immeasurably in the New York litigation. You're over time. Can you wrap up, please? Based on all of the above, I would respectfully request that the court affirm the decision of the court below. Thank you, Your Honors. All right. A lot happened there that's not in the record, but the most important question is whether the court has subject matter jurisdiction, and for that we look at the Foreign Sovereign Immunities Act. It is the sole basis for jurisdiction, subject matter jurisdiction. The action in New York is in no way inconsistent. That draws upon other statutes.  Again, those are the allegations that are in the record. It has nothing to do with commercial activity by Iraq in the United States in this case with respect to this contract, and indeed the formation of the oil for food program is your classic humanitarian governmental activity. So while counsel wishes to blur the line, there is a distinct line between governmental activity and commercial activity, and no one in this case has ever suggested that the contracts at issue here are anything but commercial activity. That's where I started, and that has nothing to do with the oil for food program and the complaint in New York, and the question is was there a direct effect, and it does require a legally significant act still under the law. This circuit, the Second Circuit, there's been no amendment to the Foreign Sovereign Immunities Act statutory amendment that affects that, and we heard counsel say that she would be speculating as to whether or not they would have been able to go forward with that transaction. That breaks the line of causation, and it's not a question for evidence down the road because the burden once we establish we're a foreign state, which we are, the burden shifts to the plaintiff to show an exception, to offer evidence of an exception, and they didn't offer that evidence below. They didn't ask for discovery. They went ahead, and the record is what it is, and there's a break in the chain of causation. Wow. So for all of these reasons, I would respectfully request that the decision of the district court be reversed, the action be dismissed for failure to establish subject matter jurisdiction, and the alternative for failure to honor the arbitration clause. Thank you. Thank you. All right. The case of Trevinkian v. Republic of Iraq is submitted, and we'll next hear the United States v. Israel del Toro Barbosa and Aiden del Toro Barbosa.
judges: Noonan, Gould, Ikuta